**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION**

Regina Clifton-Carter
Fayettville, NC, 28305

       *Plaintiff*,

   v.

Clinical Laboratory Services Inc.
of Georgia
      Serve:  Cicely Slay
              3600 The Plaza
              Charlotte, NC 28205

and,

Jazmin Battle
1816 Marion St.
Columbia, SC 29205

and,

Michelle Beeks
4312 Wilkinson Blvd.
Gastonia, NC 28056

and,

Reva Hart
189 West Athens Street, Suite 2
Winder, GA 30680

and,

Latoya Jackson
189 West Athens Street, Suite 2
Winder, GA 30680

and,

Tricia Morales,
189 West Athens Street, Suite 2
Winder, GA 30680

Civil Action No.:_____

**\*Jury Demanded\***

and,

Janay Platt
1816 Marion St.
Columbia, SC 29205

and,

Cicely Slay
3600 The Plaza
Charlotte, NC 28205

and,

Russell Watkins
189 West Athens Street, Suite 2
Winder, GA 30680

*Defendants*.

## COMPLAINT AND JURY DEMAND

Comes now the Plaintiff, Regina Clifton-Carter ("Mrs. Clifton-Carter"), by and through

undersigned counsel, and sues the above-named defendants, as cause stating as follows:

## JURISDICTION AND VENUE

1)     This Court possesses jurisdiction pursuant to 28 U.S.C. § 1331, as this is a civil

action arising under the Constitution, laws, or treaties of the United States.

2)     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2), as the

judicial district in which a substantial part of the events or omissions giving rise to the claim

occurred.

3)     Plaintiff Mrs. Clifton-Carter filed a charge of discrimination with the U.S. Equal

Employment Opportunity Commission on or about January 12, 2021 and was issued a Right to

2

Sue notice on or about March 14, 2021. *See* Exhibit A ("March 14, 2021, Right to Sue Notice for Regina Clifton-Carter"). All conditions precedent for this lawsuit have been met.

## PARTIES

4)     Plaintiff Regina Clifton-Carter ("Plaintiff," "Mrs. Clifton-Carter") is an adult resident of Cumberland County, North Carolina.

5)     Defendant Clinical Laboratory Services Inc. of Georgia ("CLS") is a *sui juris* entity incorporated under the laws of Georgia and operating as a foreign corporation in North Carolina.

6)     Defendant Michelle Beeks ("Beeks") is an adult resident of Gaston County, NC. At all times relevant to the occurrences complained of herein, on information and belief, Defendant Beeks was an employee of Defendant CLS and operating within the scope of her employment as a North Carolina and South Carolina Lead for Defendant CLS. Defendant Beeks is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Beeks on the basis of *respondeat superior* and other applicable legal doctrines.

7)     Defendant Jazmin Battle ("Battle") is an adult resident of Richland County, SC. At all times relevant to the occurrences complained of herein, Defendant Battle was an employee of Defendant CLS and operating within the scope of her employment as a mobile phlebotomist technician for Defendant CLS. Defendant Battle is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Battle on the basis of *respondeat superior* and other applicable legal doctrines.

8)     Defendant Reva Hart ("Hart") is an adult resident of Barrow County, GA. At all times relevant to the occurrences complained of herein, on information and belief, Defendant

Hart was an employee of Defendant CLS and operating within the scope of her employment as Assistant Chief Operating Officer for Defendant CLS. Defendant Hart is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Hart on the basis of *respondeat superior* and other applicable legal doctrines.

9)     Defendant Latoya Jackson ("Jackson") is an adult resident of Gaston County, NC. At all times relevant to the occurrences complained of herein, Defendant Jackson was an employee of Defendant CLS and operating within the scope of her employment as a supervisor for Defendant CLS. Defendant Jackson is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Jackson on the basis of *respondeat superior* and other applicable legal doctrines.

10)     Defendant Tricia Morales ("Morales") is an adult resident of Barrow County, GA. At all times relevant to the occurrences complained of herein, on information and belief, Defendant Morales was an employee of Defendant CLS and operating within the scope of her employment as Finance and Human Resources Administrator for Defendant CLS. Defendant Morales is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Morales on the basis of *respondeat superior* and other applicable legal doctrines.

11)     Defendant Janay Platt ("Platt") is an adult resident of Richland County, SC. At all times relevant to the occurrences complained of herein, Defendant Platt was an employee of Defendant CLS and operating within the scope of her employment as a mobile phlebotomist technician for Defendant CLS. Defendant Platt is sued both in her individual capacity and in her

capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Platt on the basis of *respondeat superior* and other applicable legal doctrines.

12)     Defendant Cicely Slay ("Slay") is an adult resident of Mecklenburg County, NC. At all times relevant to the occurrences complained of herein, Defendant Slay was an employee of Defendant CLS and operating within the scope of her employment as a district manager for Defendant CLS.  Defendant Slay is sued both in her individual capacity and in her capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Slay on the basis of *respondeat superior* and other applicable legal doctrines.

13)     Defendant Russell Watkins ("Watkins") is an adult resident of Barrow County, GA.  At all times relevant to the occurrences complained of herein, on information and belief, Defendant Watkins was an employee of Defendant CLS and operating within the scope of his employment as Chief Operating Officer for Defendant CLS.  Defendant Watkins is sued both in his individual capacity and in his capacity as an employee of Defendant CLS, who is liable for the conduct of Defendant Watkins on the basis of *respondeat superior* and other applicable legal doctrines.

## FACTS COMMON TO ALL COUNTS

14)     Plaintiff Mrs. Clifton began her employment at Defendant CLS on or about January 24, 2019.

15)     Plaintiff Mrs. Clifton was employed by Defendant CLS as a mobile phlebotomist technician.

16)     During her time working for Defendant CLS, Plaintiff Mrs. Clifton became a valued team member known for being able to draw blood from patients with difficult to find veins and was also responsible for training other team members.

5

17)    In or about September 2019, and on the basis of her stellar work performance, Plaintiff Mrs. Clifton was promoted to Lead, a position that gave her more responsibilities than other mobile phlebotomist technicians.

18)    Plaintiff Mrs. Clifton was promoted ahead of other employees of Defendant CLS, including Defendant Battle, another mobile phlebotomist technician, who took it personally that she was not the one promoted to Lead.

19)    While employed with Defendant CLS, Plaintiff Mrs. Clifton's immediate supervisor was Defendant Jackson. Defendant Jackson was employed as a supervisor by Defendant CLS. Defendant Slay was the Manager for North Carolina for Defendant CLS, and the supervisor over Defendant Jackson. Defendant Slay also had partial management responsibility for Defendant CLS's operations in South Carolina.

20)    On or about March 2, 2020, Plaintiff Mrs. Clifton was diagnosed with a brain tumor. Plaintiff Mrs. Clifton was scheduled for surgery to address the tumor on or about April 23, 2020.

21)    Despite her serious medical issue, Plaintiff Mrs. Clifton remained at work full-time until April 22, 2020, the day before her brain tumor surgery. In light of her surgery, Plaintiff Mrs. Clifton applied for leave under the Family Medical Leave Act ("FMLA") and was approved for FMLA for the period beginning April 23 to June 22, 2020.

22)    Prior to leaving on approved FMLA due to her brain tumor, Plaintiff Mrs. Clifton, in her role as Lead, was responsible for as money as six collection sites, with each site requiring at least one and one-half (1.5) hours to draw blood from all the patients at the site, as well as supply runs and other tasks, in a single shift. As Lead, Plaintiff Mrs. Clifton assisted in various operational areas, including filling-in for other mobile phlebotomist technicians when necessary.

6

23)     After her surgery and recovery, Plaintiff Mrs. Clifton returned to full employment at Defendant CLS on or about June 22, 2020.

24)     Almost immediately when Plaintiff Mrs. Clifton returned to work, Defendants Jackson and Slay began altering the conditions of Plaintiff's employment in order to discriminate against Plaintiff for Plaintiff's medical disability.  Both Defendants Jackson and Slay made their discriminatory animus towards Plaintiff Mrs. Clifton's medical disability and resultant FMLA leave after Plaintiff returned to work.

25)     Upon Plaintiff Mrs. Clifton's return, Defendant Jackson made a disparaging comment about Plaintiff's memory, stating "You remember how to do your route right?" Defendant Jackson's comment suggested that Plaintiff Mrs. Clifton's medical disability impacted her ability to do her job, even though Plaintiff had just recently returned to work and had committed no deviation from her standard tasks.  Additionally, remembering her route was never an issue before Plaintiff Mrs. Clifton left on FMLA for her medical disability of brain tumor. This statement by Defendant Jackson shows that she was mediating her treatment of Plaintiff Mrs. Clifton on the basis of Plaintiff's medical disability and on the basis of discriminatory attitudes about how Plaintiff's disability would impact Plaintiff's job performance.

26)     After Plaintiff Mrs. Clifton's return from FMLA related to her medical disability, Defendant Slay also demonstrated a discriminatory animus toward Plaintiff because of Plaintiff's disability.

27)     Per company policy, Plaintiff Mrs. Clifton had provided Defendant CLS's human resources department ("HR") with a "return to work" note, which was a note from Plaintiff Mrs. Clifton's treating physician indicating she was fit to return to work.  Defendant Slay demanded that a "return to work" note copy be addressed to her personally, and not HR, a requirement

7

never imposed on any non-disabled employee of Defendant CLS. When Plaintiff Mrs. Clifton inquired to Defendant CLS's HR department as to whether she was required to provide such a copy to Defendant Slay, HR intervened and Defendant Slay dropped her demand.

28) That Defendant Slay dropped her demand once HR intervened demonstrates that Defendant Slay was imposing a condition and burden on Plaintiff Mrs. Clifton's employment which was outside normal policy and thus unreasonable. That Defendant Slay dropped her demand upon the intervention of HR also demonstrates that she was changing the conditions of Plaintiff Mrs. Clifton's employment relative other employees of Defendant CLS.

29) On information and belief, Defendant Slay demanded a personally addressed "return to work" note because she did not believe a person with Plaintiff's medical disability could do Plaintiff's job. On information and belief, no other employee without the medical disability of brain tumor was ever made to deliver a "return to work" note personally to their state regional manager while employed at Defendant CLS.

30) Defendants Jackson and Slay acted on the discriminatory animus they manifested to Plaintiff Mrs. Clifton by making unreasonable and discriminatory alterations to the conditions of Plaintiff's employment upon Plaintiff's return to work on June 22, 2020.

31) Even though other mobile phlebotomist technicians employed by CLS typically began their shifts at 12:00 am, and even though Plaintiff Mrs. Clifton had always started at 12:00 am prior to being diagnosed with a medical disability, Defendants Jackson and Slay unreasonably and discriminatorily insisted that Plaintiff Mrs. Clifton not begin her shift until 4:00 am. Defendants Jackson and Slay also unreasonably and discriminatorily insisted that Plaintiff Mrs. Clifton accomplish all her tasks within an eight-hour time frame. Defendants Jackson and Slay imposed these two unreasonable and discriminatory requirements on Plaintiff

8

Mrs. Clifton because they knew these conditions would make it impossible for Plaintiff to accomplish all her duties as mandated, creating a pretext for false allegations of insubordination.

32)     Forcing Plaintiff Mrs. Clifton to complete her shift within eight hours and start at 4:00 am was an attempt to sabotage Plaintiff's job performance.  That this was sabotage is demonstrated by the fact that, because Defendants Jackson and Slay were Plaintiff Mrs. Clifton's immediate supervisors, Defendants Jackson and Slay knew or should have known that Plaintiff began her collections at the Village Green nursing home in Fayetteville, NC.

33)     Because Defendants Jackson and Slay were Plaintiff Mrs. Clifton's immediate supervisors, Defendants Jackson and Slay knew or should have known that the collections at each collection site, including Village Green, required at least one and one-half (1.5) hours to complete.

34)     Because Defendants Jackson and Slay were Plaintiff Mrs. Clifton's immediate supervisors, Defendants Jackson and Slay knew or should have known that Plaintiff Mrs. Clifton had as many as five (5), and generally at least three (3) additional collection sites in addition to Village Green, for a total of four (4) to six (6) sites, each requiring at least one and one-half (1.5) hours to accomplish all the blood draw collections.  Accordingly, Defendants Jackson and Slay knew or should have known that the approximate time required to draw blood at four locations, when each location would require at least one and one-half (1.5) hours to complete, is at least six (6) hours.

35)     Additionally, because Defendants Jackson and Slay were Plaintiff Mrs. Clifton's immediate supervisors, Defendants Jackson and Slay knew or should have known that the additional collection sites Plaintiff was responsible included:

a)      Carlyle Senior Care of Florence, located at 133 West Clarke Road, Florence, SC 29501;

b)      Blue Ridge of Sumter, located at 1761 Pinewood Road, Sumter, SC 29154;

c)      Springdale Healthcare Center, located at 146 Battleship Road, Camden, SC 29020; and

d)      Life Care Center of Columbia, located at 2514 Faraway Drive, Columbia, SC 29223.

36)      Defendants Jackson and Slay also knew or should have known that Plaintiff Mrs. Clifton, after her last collection at Life Care Center of Columbia in Columbia, South Carolina, had to drive to drop off all her blood sample collections at the distribution center located at 1816 Marion St., Columbia, SC 29205.  On information and belief, just these stops on Plaintiff Mrs. Clifton's route spanned 208 miles, and required almost four hours, **assuming light traffic**, just to drive between the sites and then to the distribution center in Columbia.  *See* Exhibit B ("Map of Plaintiff Regina Clifton-Carter's Blood Collection Route").

37)      Because Defendants Jackson and Slay forced Plaintiff Mrs. Clifton to begin her shift at 4:00 am instead of 12:00 am, the morning traffic rush would begin in the middle of Plaintiff's shift, which meant Plaintiff Mrs. Clifton required more than four hours just for the driving involved in her route, exclusive of time spent collecting blood or doing any necessary and related paperwork or other administrative tasks.  On information and belief, Defendants Jackson and Slay insisted that Plaintiff Mrs. Clifton complete her shift in eight hours, and then forced Plaintiff to begin at a time when she would have to combat morning rush-hour traffic, in order to make it impossible for Plaintiff to accomplish her route in time.  Defendants Jackson

10

and Slay did this so that they would have a pretext to take retaliatory action against Plaintiff Mrs. Clifton, and to have a manufactured basis for alleging insubordination.

38)     Insisting Plaintiff Mrs. Clifton begin her shift at 4:00 am was an unreasonable alteration of the conditions of Plaintiff's employment since the alteration guaranteed that Plaintiff would be unable to meet the requirement, also unreasonable, that Plaintiff complete her shift in eight hours.

39)     Plaintiff Mrs. Clifton's route alone required at least four (4) hours of driving, and at least another six (6) hours for the time required to complete all the blood draws. Plaintiff Mrs. Clifton had more collection responsibilities than other mobile phlebotomist technicians employed by Defendant CLS due to her promotion to Lead in September 2019. As a result of her heightened collection responsibilities at four to six locations, as well as other responsibilities as Lead, Plaintiff Mrs. Clifton reasonably required at least 10 hours to complete her shift.

40)     Even though Plaintiff Mrs. Clifton reasonably required at least 10 hours to complete her shift, Defendants Jackson and Slay unreasonably and retaliatorily only allowed Plaintiff Mrs. Clifton eight (8) hours to complete her shift. Defendants Jackson and Slay imposed this unreasonable eight-hour time restriction on Plaintiff Mrs. Clifton despite the fact that other phlebotomists employed by Defendant CLS and overseen by Defendants Jackson and Slay were allowed up to 10 hours to finish their shifts even though they had fewer collections to complete than Plaintiff.

41)     Despite these unreasonable alterations to the conditions of her employment, Plaintiff Mrs. Clifton remained a committed employee of Defendant CLS, and continued to diligently go about her work. Plaintiff Mrs. Clifton continued to perform her job in a satisfactory manner even in the face of these unreasonable conditions.

11

42)     In addition to the aforementioned unreasonable conditions imposed on Plaintiff by Defendants Jackson and Slay, Defendants Jackson and Slay also unreasonably barred Plaintiff Mrs. Clifton from the lab and blood collection drop-off site located at 1816 Marion St., Columbia, SC 29205.  No other mobile phlebotomist technician employed by Defendant CLS and without a history of medical disability for brain tumor was barred from the Columbia, SC lab.  On information and belief, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia lab because they discriminatorily assumed her medical disability of brain tumor would make her act hostilely towards other staff members.

43)     Prior to leaving on approved FMLA leave, Plaintiff Mrs. Clifton was not barred from the Columbia, SC lab.  When Defendant Jackson barred Plaintiff Mrs. Clifton from the Columbia, SC lab after Plaintiff's return from FMLA leave, it represented a material, discriminatory and unreasonable alteration in the conditions of Plaintiff Mrs. Clifton's employment.

44)     Barring Plaintiff Mrs. Clifton from the Columbia, SC lab was also contrary to Defendant CLS policy, and when Plaintiff Mrs. Clifton made the corporate office of Defendant CLS aware of the unreasonable alterations in the conditions of her employment, Defendants Jackson and Slay were made to allow Plaintiff Mrs. Clifton regular access to the Columbia, SC lab in or about July 2020.

45)     The employee of Defendant CLS to whom Plaintiff Mrs. Clifton complained regarding having been barred from the Columbia, SC lab was Defendant Hart.  When Plaintiff Mrs. Clifton made the report to Defendant Hart, she notified both Defendant Hart and Defendant CLS that she was being treated in a discriminatory manner.  Though Defendant Hart saw to it

12

that Plaintiff Mrs. Clifton was allowed to enter the Columbia, SC lab again, neither Defendant Hart nor Defendant CLS ensured that the discrimination ceased.

46)       Upset that corporate had reversed their unreasonable and discriminatory behavior toward Plaintiff Mrs. Clifton, Defendants Jackson and Slay plotted to see Plaintiff unfairly and discriminatorily disciplined and/or in the alternative terminated.

47)       On or about August 24, 2020, Plaintiff Mrs. Clifton had an encounter with a nurse named Angel S. ("Nurse Angel") at Village Green, her first collection site.  Prior to leaving on approved FMLA leave in April 2020, Plaintiff Mrs. Clifton had been told not to collect any samples in a section of Village Green that was being used as a covid-19 ward.  When she returned in June 2020 after her surgery, Plaintiff Mrs. Clifton continued to abide by this policy. The policy had changed in the intervening period, however, and CLS phlebotomists were now collecting blood in all areas of the nursing home.  No one ever informed Plaintiff Mrs. Clifton of this change, but for some reason, Nurse Angel became upset that Plaintiff Mrs. Clifton did not know the current policy and engaged Plaintiff Mrs. Clifton in a rude and hostile manner.

48)       After this interaction with Nurse Angel, Plaintiff Mrs. Clifton let Nurse Angel's immediate supervisors, Christy Weathersby ("Weathersby") and Shannon Grudger ("Grudger"), know that Nurse Angel had been unprofessional towards her.   Plaintiff Mrs. Clifton then left the nursing home.  On information and belief, Weathersby addressed the issue with Nurse Angel after Plaintiff had left.

49)       Nurse Angel, upset that her rude behavior had been addressed by her supervisor, contacted Defendants Jackson and Slay to file an untrue grievance against Plaintiff Mrs. Clifton in retaliation for Plaintiff speaking to Weathersby and Weathersby addressing the issue with Nurse Angel.

50)     On or about August 24, 2020, the same day she was admonished by her supervisor Weathersby regarding her rude behavior, Nurse Angel wrote a letter falsely alleging Plaintiff Mrs. Clifton had treated her in a hostile manner.  Nurse Angel transmitted this letter to Defendants Jackson and Slay.

51)     Nurse Angel also caused another nurse, Tiniyah Echols ("Nurse Echols"), to write a letter on or about August 27, 2020, falsely alleging that Plaintiff Mrs. Clifton had refused to perform a blood draw.  The blood draw in question was not refused but involved a patient with a peripherally inserted central catheter ("PICC") line.  Patients with PICC lines have their blood drawn through a port in the PICC line, but this port may not be accessed by mobile phlebotomist technicians, only registered nurses.  Nurse Echols did not want to access the port, however, because the patient in question had tested positive for covid-19.  Nurse Echols attempted to make Plaintiff Mrs. Clifton draw blood through the port to avoid potential exposure to covid-19, but Plaintiff Mrs. Clifton is a mobile phlebotomist technician who is not allowed to draw blood from PICC line ports.  Nurse Echols knew this, but upset that Plaintiff Mrs. Clifton had correctly refused to violate policy around drawing blood from PICC line ports, Nurse Echols joined with Nurse Angel to falsely accuse Plaintiff of refusing to do her job.  Nurse Echols also caused her letter to be transmitted to Defendants Jackson and Slay.

52)     At the time, Nurse Angel had a certified nursing assistant named Cynthia.  Nurse Angel tried to get Cynthia to also write a false and disparaging letter about Plaintiff Mrs. Clifton and told Cynthia that she was attempting to see Plaintiff terminated.  Cynthia knew there were no grounds for seeing Plaintiff terminated, and that Plaintiff Mrs. Clifton never refused to perform any work at Village Green.  As a result, Cynthia wrote an anonymous letter to Village Green's

Director of Nursing ("DON") to let her know that Nurse Angel was behind "a malicious lie" directed at Plaintiff.

53)     According to Cynthia's letter, Cynthia was present on August 24, 2020, the night Nurse Angel treated Plaintiff Mrs. Clifton rudely and then was addressed by her supervisor Weathersby.  Cynthia explained that Plaintiff Mrs. Clifton never refused any blood draws. Cynthia further explained that Nurse Angel had explicitly "asked me to help her get this lady terminated."  Cynthia also explained that "I was asked to write a statement against the CLS young lady [Plaintiff] but my statement is to divulge the violation of our staff nurse Angel and what her actions are around her and the lies she is telling."

54)     Defendant Jackson, having received Nurse Angel's and Nurse Echols's false letters about Plaintiff Mrs. Clifton, took advantage of the situation to have Plaintiff unfairly disciplined.  Defendant Jackson undertook no real investigation of the false claims contained in the letters from Nurses Angel and Echols.

55)     Had Defendants Jackson and Slay undertook such an investigation, they would have discovered from Nurse Angel's CNA Cynthia, as well as from Nurse Angel's supervisor Weathersby, that the allegations of Nurses Angel and Echols were false and retaliatory. Additionally, Defendant Jackson did speak to Weathersby on August 24, 2020, and Weathersby only relayed that Plaintiff Mrs. Clifton had made a complaint about Nurse Angel and made no suggestion that Plaintiff had done nothing wrong.  As such, Defendant Jackson was already aware that the allegations in Nurse Angel's letter were false, or at least disputed by Nurse Angel's immediate supervisor.  Despite this, rather than conduct an investigation into the unreliable allegations of Nurse Angel after Nurse Angel's own supervisor had contradicted them, Defendants Jackson and Slay instead sought to take advantage of the situation and consorted to

15

unfairly suspend Plaintiff Mrs. Clifton on the pretext that she had been insubordinate to a client. However, the actual motivation of Defendants Jackson and Slay were their discriminatory animus towards Plaintiff Mrs. Clifton's medical disability.

56)     Defendant Jackson and Defendant Slay, on the basis of this discriminatory animus, suspended Plaintiff Mrs. Clifton from on or about August 28 to September 11, 2020.

57)     On or about September 11, 2020, Defendants Jackson and Slay presented Plaintiff with a document titled "CLS RECORD OF EMPLOYEE CONFERENCE." The document indicated that Plaintiff Mrs. Clifton had been suspended for two weeks after treating a nurse employed by a CLS client with allegedly "unprofessional, aggressive, and rude" behavior. On information and belief, the nurse referred to in the CLS Record of Employee Conference was Nurse Angel. Additionally, the information claiming Plaintiff had been rude to Nurse Angel was untrue, and it was actually Nurse Angel who had been rude to Plaintiff and admonished for such behavior. That Nurse Angel's allegations were untrue was reported to Defendant Jackson by Nurse Angel's own supervisor, Weathersby, on August 24, 2020.

58)     The CLS Record of Employee Conference also indicated that Plaintiff Mrs. Clifton's route would be changed and that she would no longer be allowed to "go back into the facility," though no facility is specified. The change in Plaintiff Mrs. Clifton's route constituted an approximate 50 percent reduction in hours.

59)     On information and belief, Defendants Jackson and Slay issued the two-week suspension against Plaintiff Mrs. Clifton, and then changed her route and drastically reduced her hours without conducting any investigation into the claims of Nurse Angel and/or Nurse Echols, despite being given cause to do so by Wethersby. Instead, both Defendants Jackson and Slay used Nurses Angel's and Echols's false complaints as a pretext to discriminate against Plaintiff

16

for her disability and approved FMLA leave by issuing unfair and unwarranted discipline as well as by further materially altering the conditions of Mrs. Clifton's employment.

60) Defendants Jackson and Slay demanded that Plaintiff Mrs. Clifton sign the CLS Record of Employee Conference without informing Plaintiff that she was not required to. Thinking she had no choice in the matter, Plaintiff Mrs. Clifton signed the CLS Record of Employee Conference, acknowledging receipt of the materials, but not because she consented to the false claims alleged therein.

61) On or about September 21, 2020, Defendant Slay approved a vacation request by Plaintiff Mrs. Clifton for the period beginning October 18 and ending October 27, 2020.

62) On October 14, 2020, Defendant Jackson attempted to call Plaintiff Mrs. Clifton while Plaintiff was collecting blood from patients. Because she was with patients, Plaintiff Mrs. Clifton had placed her cell phone on 'do not disturb' mode in order to silence the device. Defendant Jackson became upset that she could not reach Plaintiff Mrs. Clifton at will, and angrily confronted Plaintiff when Plaintiff returned to the distribution center in Columbia, SC.

63) When Defendant Jackson angrily confronted Plaintiff Mrs. Clifton on October 14, 2020, she demanded to know why Plaintiff had not answered her phone. When Plaintiff Mrs. Clifton explained that she was with patients at the time Defendant Jackson called, Defendant Jackson grew angry and told Plaintiff that Plaintiff needed to have "her head examined," a reference to Plaintiff Mrs. Clifton's brain tumor. Defendant Jackson also threw a bag of blood samples at Plaintiff Mrs. Clifton in a disdainful manner. These hostile actions combined with Defendant Jackson's reference to Plaintiff Mrs. Clifton's brain tumor demonstrate that Defendant Jackson was motivated by a discriminatory animus related to Plaintiff's medical disability.

17

64) Plaintiff Mrs. Clifton went on vacation from October 18 to October 27, 2020. On October 27, 2020, realizing that she would not be able to return to work on October 28 as originally planned, Plaintiff Mrs. Clifton attempted to call both Defendants Jackson and Slay to let them know she would return on the 29th. Despite various attempts, Plaintiff Mrs. Clifton could not reach either of her supervisors. To ensure her supervisors knew she would not be able to return until October 29, Plaintiff Mrs. Clifton also sent a text message to both Defendants Jackson and Slay, notifying them in writing that she would return on October 29, 2020.

65) Neither Defendant Jackson nor Slay returned Plaintiff Mrs. Clifton's various communications, causing Plaintiff to call Defendant Jackson various times on October 28, 2020, to verify her communications had been received. Defendant Jackson eventually answered one of Plaintiff Mrs. Clifton's calls on October 28, 2020 and stated to Plaintiff that Plaintiff needed to call Defendant Slay regarding her text message. When Defendant Jackson told Plaintiff Mrs. Clifton, she needed to speak to Defendant Slay regarding her text message, Defendant Jackson confirmed that both her and Defendant Slay were aware of the text message and had been thereby adequately notified of Plaintiff's absence on October 28, 2020.

66) Plaintiff Mrs. Clifton then attempted to reach Defendant Slay. When she spoke to Defendant Slay, Plaintiff Mrs. Clifton was told by Defendant Slay she would be terminated on the grounds that she had no-called and no-showed on October 28, and that Defendant CLS had a policy allowing termination of an employee on such grounds.

67) Defendant Slay's representation that employees could be terminated for a single no-call, no-show was false, as this policy only applied to employees during their first 90 days of employment with Defendant CLS, during which period employees are on a probationary status. When Defendant Slay applied this policy to Plaintiff Mrs. Clifton, Plaintiff had been employed

18

by Defendant CLS for almost two years. Defendant Slay used Defendant CLS's policy for probationary employees as a pretext for terminating Plaintiff Mrs. Clifton's employment, which termination was actually motivated by a discriminatory animus toward Plaintiff due to Plaintiff's disability and FMLA leave.

68)     Shortly after she was unjustly and retaliatorily terminated, Plaintiff Mrs. Clifton applied for unemployment. Plaintiff Mrs. Clifton also protested her termination to Defendant CLS employees Chief Operating Officer Defendant Watkins and Defendant Hart. In her email, Plaintiff Mrs. Clifton let both Defendant Watkins and Hart know about her discriminatory treatment. Despite Defendants Watkins and Hart both being made aware of Plaintiff Mrs. Clifton's discriminatory treatment, and despite Defendant Hart having previously been made aware of Plaintiff's discriminatory treatment in July 2020, neither Defendant Watkins nor Watts intervened or reversed Plaintiff's discriminatory treatment, and thus gave the imprimatur of their approval to that very discrimination.

69)     Defendant CLS unjustly challenged Plaintiff Mrs. Clifton's application for unemployment, and Defendants Slay and Jackson made false allegations claiming that Plaintiff was terminated for insubordination. Plaintiff Mrs. Clifton was terminated explicitly for violating a no-show, no-call policy that did not even apply to her and at no time was Plaintiff Mrs. Clifton ever terminated for insubordination.

70)     On November 10, 2020, almost two weeks after the fact of Plaintiff Mrs. Clifton's actual termination, Defendant Jackson sent an email to Defendant Slay in order to create a false record of the alleged insubordination that allegedly underlay Plaintiff's termination. This email claims that Village Green supervisor Christy Weathersby ("Weathersby") called Defendant Jackson on August 24, 2020 and claimed that Plaintiff was acting as if she wanted to fight a

nurse at Village Green. August 24, 2020, is the same date Plaintiff Mrs. Clifton alerted

Weathersby that Nurse Angel had been rude to her and that Weathersby addressed the issue with

Nurse Angel.

71)     Defendant Jackson's allegation that Weathersby called her to complain about

Plaintiff Mrs. Clifton was false and this allegation is contradicted in a letter of support provided

later to Plaintiff by Weathersby herself, for use in Plaintiff's unemployment dispute.

72)     According to Weathersby's letter, "it is false that I, Christy Shanel Weathersby

witnessed any altercation between the nurse [Nurse Angel] and Mrs. [Clifton]. I never

mentioned anything to [Defendant Jackson] regarding such because no altercation took place in

Village Green under my supervision."

73)     Despite Plaintiff Mrs. Clifton never engaging in any aggressive or unprofessional

behavior toward Nurse Angel or any other staff member at a nursing home client of Defendant

CLS, Defendant Jackson falsely claimed that a supervisor at Village Green, a client of Defendant

CLS, had made a report against Plaintiff for wanting to fight a nurse in order to provide a pretext

for Plaintiff's unlawful and discriminatory termination.

74)     However, the August 24, 2020 incident could not have possibly been the basis for

Plaintiff Mrs. Clifton's termination in October 2020, since Plaintiff Mrs. Clifton was already

disciplined for this incident when she was suspended for two weeks unfairly from August 28 to

September 11, 2020.

75)     Defendants Jackson and Slay, in their duties as supervisory and policymaking

employees for Defendant CLS, used their position of power to make false allegations that they

had received reports of Plaintiff wanting to fight a nurse in order to harass and further retaliate

against Plaintiff for her disability and FMLA leave by denying her access to lawful unemployment benefits.

76)    In addition to Defendant Jackson's false claim in her email to Defendant Slay on November 10, 2020, that Weathersby had called to complain about Plaintiff Mrs. Clifton, Defendant Slay also sent an email communication to herself on November 10, 2020, falsely alleging that she had to remove Plaintiff Mrs. Clifton "from Columbia distribution" in March 2020 due to conflicts Plaintiff was allegedly having with other phlebotomists.  This claim was false, as Plaintiff Mrs. Clifton was not barred from the Columbia, SC lab until after her medical disability had been diagnosed and she had returned from her FMLA leave.  Defendant Slay only made this false allegation about barring Plaintiff from the lab prior to Plaintiff's FMLA leave in an email to herself months after the alleged event to create a false documentary history of discipline against Plaintiff in order to justify Defendants Jackson's and Slay's discriminatory and retaliatory termination of Plaintiff.

77)    In order to further fabricate a pretext for their discriminatory and retaliatory firing of Plaintiff Mrs. Clifton, Defendant Slay and/or in the alternative Defendant Jackson caused Defendants Battle, Platt, and Beeks to make false statements about Plaintiff.

78)    On or about November 10, 2020, Defendant Battle, at the behest of Defendant Slay and/or Jackson, wrote a letter falsely alleging that Plaintiff Mrs. Clifton was rude and mean. Defendant Battle was motivated to make these false allegations by personal animus, having previously tried to fight Plaintiff Mrs. Clifton at a work outing that occurred in November 2019 because she was jealous that Plaintiff had been promoted to Lead in September 2019.

79)    On or about November 10, 2020, Defendant Platt, at the behest of Defendant Slay and/or Jackson, wrote a letter falsely alleging that Plaintiff Mrs. Clifton was disrespectful toward

her in a vague and conclusory manner. Defendant Platt was motivated to make these false allegations by personal animus, having previously confronted Plaintiff Mrs. Clifton at a work outing that occurred in November 2019 because she was supporting Defendant Battle, Defendant Platt's close friend, in Defendant Battle's jealous crusade against Plaintiff for having been promoted to Lead in September 2019 over Defendant Battle.

80) On or about November 10, 2020, Defendant Beeks, also at the behest of Defendant Slay and/or Jackson, wrote an email to Defendant Slay stating that in July of 2020 Plaintiff Mrs. Clifton was speaking on the phone loudly at the Columbia distribution center, making a scene over having been banned from the Columbia distribution center. This statement is false, as no such scene ever occurred. The July 2020 incident that Beeks refers to is the day Plaintiff had to call Defendant CLS's corporate offices and Defendant Hart allowed her back into the Columbia lab, overruling Defendants Jackson and Slay for their discriminatory behavior and thus becoming aware of the discrimination.

81) That all the communications of November 10, 2020, are false and pretextual is also demonstrated by the fact that none of these supposed reasons, cited as the basis for firing Plaintiff Mrs. Clifton on October 28, 2020, was in possession of Defendants Jackson and Slay until they needed to concoct a false premise for Plaintiff's termination in order to discriminatorily and retaliatorily challenge her application for unemployment. When Defendants Slay and Jackson acted to terminate Plaintiff Mrs. Clifton on October 28, 2020, they were motivated solely by discriminatory animus as a result of Plaintiff's medical disability and previously approved FMLA.

82) Additionally, Defendant Slay used her position with Defendant CLS to intimidate other CLS employees who were witnesses to how Plaintiff Mrs. Clifton had been discriminated

22

against and threatened those employees with the loss of their jobs if they wrote any letters of support on behalf of Plaintiff. On information and belief, two employees threatened by Defendant Slay to prevent them from defending Plaintiff Mrs. Clifton include Pernell Routledge and Felicia West.

83)    Defendant Slay, in conjunction with Defendant Jackson, was able to discriminate against Plaintiff Mrs. Clifton, terminate Plaintiff, and recruit Defendants Battle, Beeks, and Platt to make false allegations against Plaintiff, because Defendant CLS failed to properly train and supervise Defendants Slay and Jackson in a way that ensured Defendants Slay and Jackson only disciplined employees for legitimate and not discriminatory reasons. Defendant CLS also failed to terminate Defendants Slay and Jackson despite Defendants Slay and Jackson engaging in discriminatory acts against employees with the medical disability of brain tumor, and despite becoming aware of this discrimination in July 2020 when Plaintiff Mrs. Clifton notified Defendant Hart she was being discriminated against.

84)    Defendant CLS not only failed to prevent the discrimination Plaintiff Mrs. Clifton suffered at the hands of Defendants Jackson and Slay, and of which they were aware through the knowledge of Defendant Hart, Defendant CLS also failed to prevent other of its employees from continuing the discriminatory course of conduct begun by Defendants Jackson and Slay.

85)    In or about October, 2020, and prior to leaving on her vacation, Plaintiff Mrs. Clifton had applied for financing for a Kirby vacuum cleaner, using her income from her employment at CLS. The financing representative did not reach out to Defendant CLS to confirm the employment details in Plaintiff Mrs. Clifton's finance application until approximately December, 2020, after Plaintiff had been discriminatorily terminated.

86)     When Kirby representatives reached out to Defendant CLS, they communicated with Finance and Human Resources Administrator Defendant Morales.  Defendant Morales, rather than simply inform the Kirby representatives that Plaintiff Mrs. Clifton was no longer employed by Defendant CLS, Defendant Morales took it upon herself to unfairly disparage Plaintiff Mrs. Clifton, telling representatives with Kirby that Plaintiff was untrustworthy and that they should not do business with her.  These allegations were false and harmed the reputation of Plaintiff Mrs. Clifton in the eyes of a party Defendant Morales knew was doing business with Plaintiff.

## COUNT I – AGAINST DEFENDANT CLS
### (42 U.S.C. § 12112 – ADA Wrongful Discharge)

87)     Every paragraph falling outside this count is incorporated herein by reference.

88)     At all times relevant to the occurrences complained of herein, Plaintiff Mrs. Clifton was an employee of Defendant CLS.

89)     At all times relevant to the occurrences complained of herein, Defendant CLS was a covered entity under the ADA because it is an employer.

90)     Defendant CLS, through its supervisory employees Defendants Jackson and Slay, discharged Plaintiff Mrs. Clifton from her employment on or about October 28, 2020.

91)     Prior to her termination, Plaintiff Mrs. Clifton had been diagnosed with a brain tumor on or about March 2, 2020.  When Plaintiff Mrs. Clifton's tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste. Losing one's sense of smell and taste is something that substantially limits one or more major life activities, since one can no longer taste their food and enjoy their meals, nor can they smell pleasant or even noxious odors, which can endanger an individual.  Numbness in the hands limits

24

the ability to grasp objects and numbness in a leg substantially limits mobility, a major life activity. Because Plaintiff Mrs. Clifton's symptoms substantially limited one or more major life activities, Plaintiff qualifies as an individual with a disability under Americans with Disabilities Act ("ADA").

92)     While employed by Defendant CLS, Plaintiff Mrs. Clifton filed for FMLA leave due to her brain tumor, which was approved from April 23 to June 22, 2020. When the tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste, which represent substantial limitations on one or more major life activities since headaches can be debilitating, persons generally rely on their vision for most life activities, and eating and smelling are regular life activities, among other reasons. Because Plaintiff Mrs. Clifton filed for FMLA leave with her employer due to her brain tumor which substantially impaired one or more life activities, Plaintiff also had a record of her impairment before Defendant CLS. Thus, also because Defendant CLS had a record of Plaintiff's impairment, Plaintiff Mrs. Clifton qualifies as an individual with a disability under the ADA.

93)     At the time Plaintiff Mrs. Clifton was discharged by Defendant CLS in October 2020, Plaintiff was fulfilling Defendant CLS's legitimate employment expectations.

94)     That Plaintiff Mrs. Clifton was fulfilling Defendant CLS's legitimate expectations is evinced by three witness statements and character references provided to Plaintiff by both employees of Defendant CLS and the Village Green nursing home. These character references were provided to Plaintiff for use in her unemployment dispute.

25

95)     One of the references is written by Cynthia[1] Arroyo, a former employee of

Defendant CLS who was trained by Plaintiff Mrs. Clifton.  Cynthia Arroyo writes, in part:

> Regina [Plaintiff] was exceptional teacher during my time at [Defendant] CLS.  I
> learned more tricks and techniques than I did at phlebotomy school. . . .   She is
> very professional and possesses a servant's heart when it comes to making sure
> the patients receive the upmost respect and care.  She was also very caring with
> her team. . . .   During my time working alongside Regina [Plaintiff] I never saw
> any ill or disrespectful manner about her.  She managed to keep her composure
> when nurses were uncooperative with the rules and regulations that [Defendant]
> CLS implemented . . . . I hope this letter gives an insight into the type of
> professional that Regina Carter [Plaintiff] is; She [Plaintiff] possesses the upmost
> regards from me.

*See* Exhibit C ("Plaintiff Character Reference from Cynthia Arroyo").

96)     Another reference was written by Reagan Powers, LPN ("Nurse Powers"), a nurse

who worked at Village Green.  Nurse Powers writes, in part:

> Mrs. Regina [Plaintiff] and I had a very easy and productive relationship.  I have
> experienced an individual who always showed up when expected, was very
> thorough in her practices, and carries themselves in a polite, respectable manner.
> I never had to worry about Mrs. Regina [Plaintiff] leaving labs undone,
> paperwork not completed properly, or not communicating issues to myself or my
> coworkers.  I have never witnessed any unprofessional action or behavior from
> Mrs. Regina.

*See* Exhibit D ("Plaintiff Character Reference from Reagan Powers, LPN").

97)     Another reference was written by Debbie W. Powell, LPN ("Nurse Powell"),

another nurse employed by Village Green.  Nurse Powell writes, in part:

> Regina [Plaintiff], as I have known, is very professional and knowledgeable of her
> job.  If there were any issues or concerns, she would call her supervisor
> immediately.  I never knew her to be confrontational or out of character anyone.
> Her focus is doing her job and getting it done in timely manner.  **The resident's
> like when she came to draw their blood.  They knew most of the time, they
> would only get stuck once by a needle.  The grew to trust & like her**.

*See* Exhibit E ("Plaintiff Character Reference from Debbie W. Powell, LPN") (emphasis added).

---

[1] This is not the same Cynthia who worked at the Village Green nursing home and mentioned *supra* in paragraphs 52-55.

98) The circumstances of Plaintiff Mrs. Clifton's discharge from Defendant CLS raise a reasonable inference of unlawful discrimination.

99) Supervisory employees of Defendant CLS, including Defendants Jackson and Slay, were aware of Plaintiff Mrs. Clifton's disability. For example, Defendant Jackson made reference to Plaintiff Mrs. Clifton's disability when she asked Plaintiff whether Plaintiff still remembered her route upon Plaintiff's return from her FMLA leave in or about late June 2020.

100) Defendant Slay segregated Plaintiff on the basis of Plaintiff's disability when Defendant Slay insisted Plaintiff personally address a return to work note to Defendant Slay. No other non-disabled employee was ever subjected to this requirement, and thus this action separated and therefore segregated Plaintiff from other employees of Defendant CLS on the basis of Plaintiff's disability. This action also represents the use of a standard, criteria, or method that has the effect of discrimination on the basis of disability, since the requirement of a personal return to work note was only imposed on a disabled employee, namely Plaintiff. Accordingly, insisting Plaintiff Mrs. Clifton provide a personal return to work note was a prohibited act of discrimination under the ADA.

101) Defendants Jackson and Slay also acted in concert upon Plaintiff's return from FMLA to limit Plaintiff by forcing Plaintiff to begin her shift four hours later than non-disabled mobile phlebotomist technicians, and to complete her tasks in less time than was afforded non-disabled mobile phlebotomist technicians, as described elsewhere herein. Limiting Plaintiff in this way adversely affected the status of Plaintiff because it marked Plaintiff as disabled relative her other co-workers. These actions also sought to limit Plaintiff's overall activities, which reduced her status as Lead. As a result, forcing Plaintiff to start her shift later and affording her less time to complete her shift was a prohibited act of discrimination under the ADA.

27

102)     In July 2020, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab and distribution center.  On information and belief, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab because they believed her brain tumor disability would make Plaintiff behave erratically.  When Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab on the basis that Plaintiff's disability would allegedly make Plaintiff behave erratically, they segregated Plaintiff on the basis of her disability in a way that adversely affected the status of Plaintiff, marking her as different among her fellow mobile phlebotomist technicians.  Thus segregating an employee on the basis of a disability is an act of prohibited discrimination under the ADA.  Additionally, using Plaintiff's disability as a criteria for determining Plaintiff's access to the Columbia, SC, lab had the effect of discriminating against Plaintiff on the basis of Plaintiff's disability and is thus a prohibited act under the ADA.

103)     On or about October 14, 2020, Defendant Jackson referred to Plaintiff Mrs. Clifton's disability when she told Plaintiff to have her "head examined" after Defendant Jackson could not reach Plaintiff by phone at will.

104)     Approximately two weeks later, Defendants Jackson and Slay terminated Plaintiff Mrs. Clifton and thus discharged her from the employment of Defendant CLS.  In order to discharge Plaintiff Mrs. Clifton, Defendants Jackson and Slay applied a policy only applicable to probationary employees to Plaintiff, even though Plaintiff was not a probationary employee.

105)     The circumstances leading up to Plaintiff Mrs. Clifton's discharge from Defendant CLS, in which Plaintiff was subjected to routine discriminatory treatment by Defendants Jackson and Slay, was discharged under a policy that did not apply to her, and combined with the fact that Defendants Jackson and Slay worked to create a pretext for

Plaintiff's termination **only after** Plaintiff had already been discharged, raise a reasonable inference of unlawful discrimination under the ADA due to Plaintiff's disability.

106)     As a direct and proximate result of the conduct described in this count and elsewhere herein, for which Defendant CLS, as a covered entity, is liable under the ADA, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## <u>COUNT II – AGAINST DEFENDANT CLS</u>
**(42 U.S.C. § 12203 – ADA Unlawful Retaliation)**

107)     Every paragraph falling outside this count is incorporated herein by reference.

108)     At all times relevant to the occurrences complained of herein, Plaintiff Mrs. Clifton was an employee of Defendant CLS.

109)     At all times relevant to the occurrences complained of herein, Defendant CLS was a covered entity under the ADA because it is an employer.

110)     On or about March 2, 2020, Plaintiff Mrs. Clifton was diagnosed with a brain tumor.  When Plaintiff Mrs. Clifton's tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste.  Losing one's sense of smell and taste is something that substantially limits one or more major life activities, since one

29

can no longer taste their food and enjoy their meals, nor can they smell pleasant or even noxious odors, which can endanger an individual. Numbness in the hands limits the ability to grasp objects and numbness in a leg substantially limits mobility, a major life activity. Because Plaintiff Mrs. Clifton's symptoms substantially limited one or more major life activities, Plaintiff qualifies as an individual with a disability under Americans with Disabilities Act ("ADA").

111)     While employed by Defendant CLS, Plaintiff Mrs. Clifton filed for FMLA leave due to her brain tumor, which was approved from April 23 to June 22, 2020. When the tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste, which represent substantial limitations on one or more major life activities since headaches can be debilitating, persons generally rely on their vision for most life activities, and eating and smelling are regular life activities, among other reasons. Because Plaintiff Mrs. Clifton filed for FMLA leave with her employer due to her brain tumor which substantially impaired one or more life activities, Plaintiff also had a record of her impairment before Defendant CLS. Thus, also because Defendant CLS had a record of Plaintiff's impairment, Plaintiff Mrs. Clifton qualifies as an individual with a disability under the ADA.

112)     On or about October 28, 2020, Defendant CLS, through its supervisory employees Defendants Jackson and Slay, discharged Plaintiff Mrs. Clifton from her employment. Discharge is an adverse employment action.

113)     Prior to her discharge, Plaintiff Mrs. Clifton experienced acts of discrimination related to her disability.

114)     Defendant Jackson made reference to Plaintiff Mrs. Clifton's disability when she asked Plaintiff whether Plaintiff still remembered her route upon Plaintiff's return from her FMLA leave in or about late June 2020.

115)     Defendant Slay segregated Plaintiff on the basis of Plaintiff's disability when Defendant Slay insisted Plaintiff personally address a return to work note to Defendant Slay.  No other non-disabled employee was ever subject to this requirement, and thus this action separated and therefore segregated Plaintiff from other employees of Defendant CLS on the basis of Plaintiff's disability.  This action also represents the use of a standard, criteria, or method that has the effect of discrimination on the basis of disability, since the requirement of a personal return to work note was only imposed on a disabled employee, namely Plaintiff.  Accordingly, insisting Plaintiff Mrs. Clifton provide a personal return to work note was a prohibited act of discrimination under the ADA.

116)     Defendants Jackson and Slay also acted in concert upon Plaintiff's return from FMLA to limit Plaintiff by forcing Plaintiff to begin her shift four hours later than non-disabled mobile phlebotomist technicians, and to complete her tasks in less time than was afforded non-disabled mobile phlebotomist technicians, as described elsewhere herein.  Limiting Plaintiff in this way adversely affected the status of Plaintiff because it marked Plaintiff as disabled relative her other co-workers, and reduced the time for her responsibilities as Lead.  As a result, forcing Plaintiff to start her shift later and affording her less time to complete her shift was a prohibited act of discrimination under the ADA.

117)     In July 2020, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab and distribution center.  On information and belief, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab because they believed her brain

tumor disability would make Plaintiff behave erratically. When Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab on the basis that Plaintiff's disability would allegedly make Plaintiff behave erratically, they segregated Plaintiff on the basis of her disability in a way that adversely affected the status of Plaintiff, marking her as different among her fellow mobile phlebotomist technicians. Thus segregating an employee on the basis of a disability is an act of prohibited discrimination under the ADA. Additionally, using Plaintiff's disability as a criteria for determining Plaintiff's access to the Columbia, SC, lab had the effect of discriminating against Plaintiff on the basis of Plaintiff's disability and is thus a prohibited act under the ADA.

118)    As described elsewhere herein, Plaintiff Mrs. Clifton complained about the discriminatory practices of Defendants Jackson and Slay to the corporate offices of Defendant CLS when she was asked by Defendant Slay for a personal return to work note, and when she was barred from the Columbia, SC, lab. When she complained to the corporate offices of Defendant CLS about this discriminatory treatment, Plaintiff Mrs. Clifton opposed the discriminatory acts made unlawful by the ADA. Opposing treatment that is discriminatory under the ADA constitutes a protected activity under the ADA.

119)    After Plaintiff Mrs. Clifton complained about these discriminatory acts, the corporate offices of Defendant CLS intervened in the discrimination of Defendants Jackson and Slay. Not long after their discriminatory actions were reversed, Defendants Jackson and Slay unlawfully discharged Plaintiff by applying a policy that only applied to probationary employees at a time Plaintiff was not on probation. On information and belief, Defendants Jackson and Slay took this action for Plaintiff having opposed their discriminatory and unlawful conduct under the ADA.

120) This causal link is made evident by the efforts, as described elsewhere herein, of Defendants Jackson and Slay to supply a non-discriminatory rationale for the unlawful discharge which effort took place only after Plaintiff Mrs. Clifton had already been terminated, and was therefore clearly pretextual.

121) As a direct and proximate result of the conduct described in this count and elsewhere herein, for which Defendant CLS, as a covered entity, is liable under the ADA, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT III – AGAINST DEFENDANT CLS
### (42 U.S.C. § 12101 et seq. – ADA Disability Discrimination)

122) Every paragraph falling outside this count is incorporated herein by reference.

123) At all times relevant to the occurrences complained of herein, Plaintiff Mrs. Clifton was an employee of Defendant CLS.

124) At all times relevant to the occurrences complained of herein, Defendant CLS was a covered entity under the ADA because it is an employer.

125) On or about March 2, 2020, Plaintiff Mrs. Clifton was diagnosed with a brain tumor. When Plaintiff Mrs. Clifton's tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of

the left hand, numbness in the left leg, and the loss of smell and taste.  Losing one's sense of smell and taste is something that substantially limits one or more major life activities, since one can no longer taste their food and enjoy their meals, nor can they smell pleasant or even noxious odors, which can endanger an individual.  Numbness in the hands limits the ability to grasp objects and numbness in a leg substantially limits mobility, a major life activity.  Because Plaintiff Mrs. Clifton's symptoms substantially limited one or more major life activities, Plaintiff qualifies as an individual with a disability under Americans with Disabilities Act ("ADA").

126)    While employed by Defendant CLS, Plaintiff Mrs. Clifton filed for FMLA leave due to her brain tumor, which was approved from April 23 to June 22, 2020.  When the tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste, which represent substantial limitations on one or more major life activities since headaches can be debilitating, persons generally rely on their vision for most life activities, and eating and smelling are regular life activities, among other reasons.  Because Plaintiff Mrs. Clifton filed for FMLA leave with her employer due to her brain tumor which substantially impaired one or more life activities, Plaintiff also had a record of her impairment.  Thus, also because Defendant CLS had a record of Plaintiff's impairment, Plaintiff Mrs. Clifton qualifies as an individual with a disability under the ADA.

127)    On or about October 28, 2020, Defendant CLS, through its supervisory employees Defendants Jackson and Slay, discharged Plaintiff Mrs. Clifton from her employment.  Discharge is an adverse employment action.

128)    Prior to her discharge Plaintiff Mrs. Clifton was qualified for her employment as a mobile phlebotomist technician.  That Plaintiff Mrs. Clifton was qualified for her employment is

evinced by three witness statements and character references provided to Plaintiff by both employees of Defendant CLS and the Village Green nursing home, where Plaintiff was falsely accused by Nurse Angel of rudeness when it was Nurse Angel who was rude. These character references were provided to Plaintiff for use in her unemployment dispute.

129) One of the references is written by Cynthia[2] Arroyo, a former employee of Defendant CLS who was trained by Plaintiff Mrs. Clifton. Cynthia Arroyo writes, in part:

> Regina [Plaintiff] was exceptional teacher during my time at [Defendant] CLS. I learned more tricks and techniques than I did at phlebotomy school. . . . She is very professional and possesses a servant's heart when it comes to making sure the patients receive the upmost respect and care. She was also very caring with her team. . . . During my time working alongside Regina [Plaintiff] I never saw any ill or disrespectful manner about her. She managed to keep her composure when nurses were uncooperative with the rules and regulations that [Defendant] CLS implemented . . . . I hope this letter gives an insight into the type of professional that Regina Carter [Plaintiff] is; She [Plaintiff] possesses the upmost regards from me.

*See* Exhibit C ("Plaintiff Character Reference from Cynthia Arroyo").

130) Another reference was written by Reagan Powers, LPN ("Nurse Powers"), a nurse who worked at Village Green. Nurse Powers writes, in part:

> Mrs. Regina [Plaintiff] and I had a very easy and productive relationship. I have experienced an individual who always showed up when expected, was very thorough in her practices, and carries themselves in a polite, respectable manner. I never had to worry about Mrs. Regina [Plaintiff] leaving labs undone, paperwork not completed properly, or not communicating issues to myself or my coworkers. I have never witnessed any unprofessional action or behavior from Mrs. Regina.

*See* Exhibit D ("Plaintiff Character Reference from Reagan Powers, LPN").

131) Another reference was written by Debbie W. Powell, LPN ("Nurse Powell"), another nurse employed by Village Green. Nurse Powell writes, in part:

---

[2] This is not the same Cynthia who worked at the Village Green nursing home and mentioned *supra* in paragraphs 52-55.

Regina [Plaintiff], as I have known, is very professional and knowledgeable of her job. If there were any issues or concerns, she would call her supervisor immediately. I never knew her to be confrontational or out of character anyone. Her focus is doing her job and getting it done in timely manner. **The resident's like when she came to draw their blood. They knew most of the time, they would only get stuck once by a needle. The grew to trust & like her**.

See Exhibit E ("Plaintiff Character Reference from Debbie W. Powell, LPN") (emphasis added).

132) Prior to her discharge, Plaintiff Mrs. Clifton experienced acts of discrimination related to her disability.

133) Defendant Jackson made reference to Plaintiff Mrs. Clifton's disability when she asked Plaintiff whether Plaintiff still remembered her route upon Plaintiff's return from her FMLA leave in or about late June 2020.

134) Defendant Slay segregated Plaintiff on the basis of Plaintiff's disability when Defendant Slay insisted Plaintiff personally address a return to work note to Defendant Slay. No other non-disabled employee was ever subject to this requirement, and thus this action separated and therefore segregated Plaintiff from other employees of Defendant CLS on the basis of Plaintiff's disability. This action also represents the use of a standard, criteria, or method that has the effect of discrimination on the basis of disability, since the requirement of a personal return to work note was only imposed on a disabled employee, namely Plaintiff. Accordingly, insisting Plaintiff Mrs. Clifton provide a personal return to work note was a prohibited act of discrimination under the ADA.

135) Defendants Jackson and Slay also acted in concert upon Plaintiff's return from FMLA to limit Plaintiff by forcing Plaintiff to begin her shift four hours later than non-disabled mobile phlebotomist technicians, and to complete her tasks in less time than was afforded non-disabled mobile phlebotomist technicians, as described elsewhere herein. Limiting Plaintiff in this way adversely affected the status of Plaintiff because it marked Plaintiff as disabled relative

36

her other co-workers and reduced her duties as Lead.  As a result, forcing Plaintiff to start her shift later and affording her less time to complete her shift was a prohibited act of discrimination under the ADA.

136)    In July 2020, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab and distribution center.  On information and belief, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab because they believed her brain tumor disability would make Plaintiff behave erratically.  When Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab on the basis that Plaintiff's disability would allegedly make Plaintiff behave erratically, they segregated Plaintiff on the basis of her disability in a way that adversely affected the status of Plaintiff, marking her as different among her fellow mobile phlebotomist technicians.  Thus segregating an employee on the basis of a disability is an act of prohibited discrimination under the ADA.  Additionally, using Plaintiff's disability as a criteria for determining Plaintiff's access to the Columbia, SC, lab had the effect of discriminating against Plaintiff on the basis of Plaintiff's disability and is thus a prohibited act under the ADA.

137)    When Defendants Jackson and Slay discharged Plaintiff Mrs. Clifton, it was a continuation of this discriminatory pattern of behavior on the basis of Plaintiff's disability.  That Defendants Jackson and Slay were motivated to take the adverse employment action of discharge against Plaintiff by Plaintiff's disability is demonstrated by the efforts, as described elsewhere herein, of Defendants Jackson and Slay to supply a non-discriminatory rationale for the unlawful discharge which efforts took place **only after** Plaintiff Mrs. Clifton had already been terminated, and was therefore clearly pretextual.

37

138)    As a direct and proximate result of the conduct described in this count and elsewhere herein, for which Defendant CLS, as a covered entity, is liable under the ADA, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT IV – AGAINST DEFENDANTS CLS
### (NCPDPA Wrongful Discharge)

139)    Every paragraph falling outside this count is incorporated herein by reference.

140)    It is against the public policy of North Carolina to allow discrimination on the basis of disability, and thus a discriminatory discharge from employment on the basis of disability constitutes an exception to North Carolina's general at-will employment rule.

141)    At all times relevant to the occurrences complained of herein, Plaintiff Mrs. Clifton was an employee of Defendant CLS.

142)    At all times relevant to the occurrences complained of herein, Defendant CLS was a covered entity under the North Carolina Persons with Disabilities Protection Act (NCPDPA") because it is an employer with more than 15 employees operating in North Carolina.

143)    On or about March 2, 2020, Plaintiff Mrs. Clifton was diagnosed with a brain tumor.  When Plaintiff Mrs. Clifton's tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of

38

the left hand, numbness in the left leg, and the loss of smell and taste. Losing one's sense of smell and taste is something that substantially limits one or more major life activities, since one can no longer taste their food and enjoy their meals, nor can they smell pleasant or even noxious odors, which can endanger an individual. Numbness in the hands limits the ability to grasp objects and numbness in a leg substantially limits mobility, a major life activity. Because Plaintiff Mrs. Clifton's symptoms substantially limited one or more major life activities, Plaintiff qualifies as an individual with a disability under NCPDPA.

144) While employed by Defendant CLS, Plaintiff Mrs. Clifton filed for FMLA leave due to her brain tumor, which was approved from April 23 to June 22, 2020. When the tumor was diagnosed, it was causing severe headaches, dizzy spells, blurred vision, loss of peripheral vision, numbness in the middle and ring fingers of the left hand, numbness in the left leg, and the loss of smell and taste, which represent substantial limitations on one or more major life activities since headaches can be debilitating, persons generally rely on their vision for most life activities, and eating and smelling are regular life activities, among other reasons. Because Plaintiff Mrs. Clifton filed for FMLA leave with her employer due to her brain tumor which substantially impaired one or more life activities, Plaintiff also had a record of her impairment. Thus, also because Defendant CLS had a record of Plaintiff's impairment, Plaintiff Mrs. Clifton qualifies as an individual with a disability under the NCPDPA.

145) On or about October 28, 2020, Defendant CLS, through its supervisory employees Defendants Jackson and Slay, discharged Plaintiff Mrs. Clifton from her employment.

146) Prior to Plaintiff's discharge, Defendants Jackson and Slay materially altered the terms, conditions, and/or privileges of Plaintiff Mrs. Clifton's employment on the basis of her disability.

39

147)     Defendant Jackson made reference to Plaintiff Mrs. Clifton's disability when she asked Plaintiff whether Plaintiff still remembered her route upon Plaintiff's return from her FMLA leave in or about late June 2020.

148)     Defendant Slay discriminated against Plaintiff on the basis of Plaintiff's disability when Defendant Slay insisted Plaintiff personally address a return to work note to Defendant Slay.  No other non-disabled employee was ever subject to this requirement, and thus this action represents discrimination against a disabled employee with respect to the terms, conditions, or privileges of employment, since the requirement of a personal return to work note was only imposed on a disabled employee, namely Plaintiff.  Accordingly, insisting Plaintiff Mrs. Clifton provide a personal return to work note was a prohibited act of discrimination under the NCPDPA.

149)     Defendants Jackson and Slay also acted in concert upon Plaintiff's return from FMLA to limit Plaintiff by forcing Plaintiff to begin her shift four hours later than non-disabled mobile phlebotomist technicians, and to complete her tasks in less time than was afforded non-disabled mobile phlebotomist technicians, as described elsewhere herein.  No other non-disabled employee was ever subject to this requirement, and thus this action represents discrimination against a disabled employee with respect to the terms, conditions, or privileges of employment, since this requirement was only imposed on a disabled employee, namely Plaintiff.  As a result, forcing Plaintiff to start her shift later and affording her less time to complete her shift was a prohibited act of discrimination under the NCPDPA.

150)     In July 2020, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab and distribution center.  On information and belief, Defendants Jackson and Slay barred Plaintiff Mrs. Clifton from the Columbia, SC, lab because they believed her brain

40

tumor disability would make Plaintiff behave erratically. No other non-disabled employee was ever barred from the lab in question, and thus this action represents discrimination against a disabled employee with respect to the terms, conditions, or privileges of employment, since only Plaintiff a disabled employee, was ever barred from the lab in question. As a result, barring Plaintiff Mrs. Clifton from the Columbia, SC, lab was a prohibited act of discrimination under the NCPDPA.

151)     When Defendants Jackson and Slay discharged Plaintiff Mrs. Clifton, it was a continuation of this discriminatory pattern of behavior on the basis of Plaintiff's disability. That Defendants Jackson and Slay were motivated to take the adverse employment action of discharge against Plaintiff by Plaintiff's disability is demonstrated by the efforts, as described elsewhere herein, of Defendants Jackson and Slay to supply a non-discriminatory rationale for the unlawful discharge which efforts took place **only after** Plaintiff Mrs. Clifton had already been terminated, and was therefore clearly pretextual.

152)     As a direct and proximate result of the conduct described in this count and elsewhere herein, for which Defendant CLS, as a covered entity, is liable under the NCPDPA, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT V – AGAINST DEFENDANTS CLS, BATTLE, BEEKS, JACKSON, MORALES, PLATT, AND SLAY
### (Fraud)

153)     Every paragraph falling outside this count is incorporated herein by reference.

154)     When Defendants Battle, Beeks, Jackson, Platt, and Slay compiled false accounts to create a pretext after the fact for the discharge of Plaintiff Mrs. Clifton, as described elsewhere herein, they made a series of false representations reasonably calculated to deceive and with the intent to deceive.

155)     On November 10, 2020, almost two weeks after the fact of Plaintiff Mrs. Clifton's actual termination, Defendant Jackson sent an email to Defendant Slay in order to create a false record of the alleged insubordination that allegedly underlay Plaintiff's termination.  This email claims that Village Green supervisor Christy Weathersby ("Weathersby") called Defendant Jackson on August 24, 2020, and claimed that Plaintiff was acting as if she wanted to fight a nurse at Village Green.  August 24, 2020, is the same date Plaintiff Mrs. Clifton alerted Weathersby that Nurse Angel had been rude to her and that Weathersby addressed the issue with Nurse Angel.

156)     Defendant Jackson's allegation that Weathersby called her to complain about Plaintiff Mrs. Clifton was false and this allegation is contradicted in a letter of support provided later to Plaintiff by Weathersby herself, for use in Plaintiff's unemployment dispute.

157)     According to Weathersby's letter, "it is false that I, Christy Shanel Weathersby witnessed any altercation between the nurse [Nurse Angel] and Mrs. [Clifton].  I never mentioned anything to [Defendant Jackson] regarding such because no altercation took place in Village Green under my supervision."

42

158)     Despite Plaintiff Mrs. Clifton never engaging in any aggressive or unprofessional behavior toward Nurse Angel or any other staff member at a nursing home client of Defendant CLS, Defendant Jackson falsely claimed that a supervisor at Village Green, a client of Defendant CLS, had made a report against Plaintiff for wanting to fight a nurse in order to provide a pretext for Plaintiff's unlawful and discriminatory termination.

159)     However, the August 24, 2020 incident could not have possibly been the basis for Plaintiff Mrs. Clifton's termination in October 2020, since Plaintiff Mrs. Clifton was already disciplined for this incident when she was suspended for two weeks unfairly from August 28 to September 11, 2020.

160)     Defendants Jackson and Slay, in their duties as supervisory and policymaking employees for Defendant CLS, used their position of power to make false allegations that they had received reports of Plaintiff wanting to fight a nurse in order to harass and further retaliate against Plaintiff for her disability and FMLA leave by denying her access to lawful unemployment benefits.

161)     In addition to Defendant Jackson's false claim in her email to Defendant Slay on November 10, 2020, that Weathersby had called to complain about Plaintiff Mrs. Clifton, Defendant Slay also sent an email communication to herself on November 10, 2020, falsely alleging that she had to remove Plaintiff Mrs. Clifton "from Columbia distribution" in March 2020 due to conflicts Plaintiff was allegedly having with other phlebotomists.  This claim was false, as Plaintiff Mrs. Clifton was not barred from the Columbia, SC lab until after her medical disability had been diagnosed and she had returned from her FMLA leave.  Defendant Slay only made this false allegation about barring Plaintiff from the lab prior to Plaintiff's FMLA leave in an email to herself months after the alleged event to create a false documentary history of

43

discipline against Plaintiff in order to justify Defendants Jackson's and Slay's discriminatory and retaliatory termination of Plaintiff.

162)     In order to further fabricate a pretext for their discriminatory and retaliatory firing of Plaintiff Mrs. Clifton, Defendant Slay and/or in the alternative Defendant Jackson caused Defendants Battle, Platt, and Beeks to make false statements about Plaintiff.

163)     On or about November 10, 2020, Defendant Battle, at the behest of Defendant Slay and/or Jackson, wrote a letter falsely alleging that Plaintiff Mrs. Clifton was rude and mean. Defendant Battle was motivated to make these false allegations by personal animus, having previously tried to fight Plaintiff Mrs. Clifton at a work outing that occurred in November 2019 because she was jealous that Plaintiff had been promoted to Lead in September, 2019.

164)     On or about November 10, 2020, Defendant Platt, at the behest of Defendant Slay and/or Jackson, wrote a letter falsely alleging that Plaintiff Mrs. Clifton was disrespectful toward her in a vague and conclusory manner.  Defendant Platt was motivated to make these false allegations by personal animus, having previously confronted Plaintiff Mrs. Clifton at a work outing that occurred in November 2019 because she was supporting Defendant Battle, Defendant Platt's close friend, in Defendant Battle's jealous crusade against Plaintiff for having been promoted to Lead in September, 2019 over Defendant Battle.

165)     On or about November 10, 2020, Defendant Beeks, also at the behest of Defendant Slay and/or Jackson, wrote an email to Defendant Slay stating that in July of 2020 Plaintiff Mrs. Clifton was speaking on the phone loudly at the Columbia distribution center, making a scene over having been banned from the Columbia distribution center.  This statement is false, as no such scene ever occurred.  The July 2020 incident that Beeks refers to is the day Plaintiff had to call Defendant CLS's corporate offices and Defendant Hart allowed her back into

44

the Columbia lab, overruling Defendants Jackson and Slay for their discriminatory behavior and thus becoming aware of the discrimination.

166)     That all the communications of November 10, 2020, are false and pretextual is also demonstrated by the fact that none of these supposed reasons, cited as the basis for firing Plaintiff Mrs. Clifton on October 28, 2020, was in possession of Defendants Jackson and Slay until they needed to concoct a false premise for Plaintiff's termination in order to discriminatorily and retaliatorily challenge her application for unemployment.  When Defendants Slay and Jackson acted to terminate Plaintiff Mrs. Clifton on October 28, 2020, they were actually motivated solely by discriminatory animus as a result of Plaintiff's medical disability and previously approved FMLA.

167)     The false representations of Defendants Battle, Beeks, Jackson, Platt, and Slay were intended to provide a non-discriminatory pretext for Plaintiff Mrs. Clifton's firing, with the further intent of injuring Plaintiff by denying Plaintiff her lawful unemployment benefits.  That the false representations were intended to deceive is made clear by the fact that they purport to provide non-discriminatory reasons for Plaintiff's discharge but **only after** Plaintiff had been discriminatorily discharged.  These false representations did in fact deceive and resulted in damage to Plaintiff who is still fighting to obtain her lawful unemployment benefits because the fraud of the Defendants named herein were believed by the relevant authorities.

168)     Additionally, Defendant Morales made knowingly false and disparaging representations to a finance partner of Kirby vacuum cleaners, injuring Plaintiff by harming her reputation before a financial lender and business contact who denied Plaintiff access to credit as a result.

169)     As a direct and proximate result of the conduct of the Defendants named herein, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

### COUNT VI – AGAINST DEFENDANT CLS
**(Breach of Contract)**

170)     Every paragraph falling outside this count is incorporated herein by reference.

171)     At all times relevant to the occurrences complained of herein, Plaintiff Mrs. Clifton was an employee of Defendant CLS.

172)     The employment and disciplinary policies of Defendant CLS, which are in writing, constitute a written contract between Defendant CLS and Plaintiff Mrs. Clifton.

173)     Defendant CLS breached that contract when, through its supervisory and policymaking employees Defendants Hart, Jackson, Slay, and Watkins, it allowed Plaintiff Mrs. Clifton to be terminated on the basis of a policy that only applied to probationary employees, which Plaintiff was not.

174)     As a direct and proximate result of this breach of contract, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses,

46

inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT VII – AGAINST ALL DEFENDANTS
### (Intentional Infliction of Emotional Distress)

175)    Every paragraph falling outside of this count is incorporated herein by reference.

176)    When the Defendants, as described elsewhere herein, discriminated against and then discharged Plaintiff Mrs. Clifton from her employment on the basis of her disability and by use of fraud, they engaged in behavior a reasonable person would consider beyond all possible bounds of decency, and utterly intolerable in a civilized community, since employment is essential to both survival and self-image.

177)    As described elsewhere herein, the conduct of Defendants was undertaken with the knowledge that, or with reckless disregard to whether, it would injure Plaintiff Mrs. Clifton in the form of causing severe emotional distress such as depression.  Defendants knew their actions would cause severe emotional distress because discriminating against someone on the basis of their disability, causing them to be discharged from their employment due to discriminatory animus, and defaming them to business relations are all behaviors generally known to cause severe emotional distress such as depression.

178)    As a direct and proximate result of the Defendants' conduct, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses,

47

inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT VIII – AGAINST DEFENDANT MORALES
### (Defamation)

179) Every paragraph falling outside this count is incorporated herein by reference.

180) Defendant Morales falsely and defamatorily disparaged Plaintiff Mrs. Clifton before the third-party of the finance partner of Kirby vacuums. When the finance partner of Kirby vacuums reached out to Defendant CLS to confirm details of Plaintiff Mrs. Clifton's credit application, they reached Defendant Morales who falsely alleged that Plaintiff could not be trusted as well as falsely stating that Kirby should not do business with Plaintiff.

181) As a direct and proximate result of Defendant Morales's defamatory statements to the third-party of the finance partner of Kirby vacuums, Plaintiff's reputation for credit-worthiness was injured, and Plaintiff was initially denied financing for the Kirby vacuum product which she had sought to purchase. Plaintiff was eventually able to finance the vacuum through another finance company to whom she was never defamed, demonstrating that it was Defendant Morales's actions which previously injured her.

182) Defendant Morales made the disparaging and false statements at issue with the specific intention of injuring Plaintiff's reputation, financial credit, and ability to obtain financing.

183) Also as a direct and proximate result of the Defendants' conduct, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional

48

distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendant in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT IX – AGAINST ALL DEFENDANTS
### (And/or in the Alternative Negligence or Gross Negligence)

184) Every paragraph falling outside this count is incorporated herein by reference.

185) The Defendants named herein all possess a duty of ordinary care toward Plaintiff Mrs. Clifton, including conducting themselves lawfully.

186) Defendant CLS is liable for the conduct of the individual Defendants named herein on the basis of *respondeat superior* and other applicable legal doctrines.

187) Defendants Jackson and Slay breached their duty of ordinary care when they discriminated against Plaintiff Mrs. Clifton by altering the terms of Plaintiff's employment on the basis of Plaintiff's disability and then discharging Plaintiff for the same reason, since a person exercising ordinary care would not engage in such conduct. In the alternative, Defendants' conduct was grossly negligent.

188) Defendants Jackson and Slay also breached their duty of ordinary care when they caused Defendants Battle, Beeks, and Platt to write false letters to create a pretext for Plaintiff Mrs. Clifton's unlawful discharge, since a person exercising ordinary care would not engage in such conduct. In the alternative, Defendants' conduct was grossly negligent.

49

189)     Defendants Battle, Beeks, and Platt breached their duty of ordinary care when they caused false letters to issue against Plaintiff Mrs. Clifton so that Defendants Jackson and Slay would have a pretext for their discriminatory actions relative Plaintiff, since a person exercising ordinary care would not engage in such conduct.  In the alternative, Defendants' conduct was grossly negligent.

190)     Defendants Hart and Watkins breached their duty of ordinary care when they failed to reasonably investigate the circumstances of Plaintiff Mrs. Clifton's termination and when they, on that basis, allowed Plaintiff to be discriminated against on the basis of Plaintiff's disability, since a person exercising ordinary care would not engage in such conduct.  In the alternative, Defendants' conduct was grossly negligent.

191)     Defendant Morales breached her ordinary care of duty when she made false and defamatory statements to a finance provider about Plaintiff, which caused Plaintiff to be denied credit and her reputation injured, since a person exercising ordinary care would not engage in such conduct.  Plaintiff later obtained credit from a creditor before whom she was never defamed, demonstrating that it was Defendant Morales' false comments that caused Plaintiff's reputation for credit to be injured and financing denied.  In the alternative, Defendant Morales' conduct was grossly negligent.

192)     As a direct and proximate result of the Defendants' conduct, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

50

Wherefore, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## COUNT X – AGAINST ALL DEFENDANTS
### (And/or in the Alternative Negligent Infliction of Emotional Distress)

193)    Every paragraph falling outside this count is incorporated herein by reference.

194)    The Defendants named herein all possess a duty of ordinary care toward Plaintiff Mrs. Clifton, including conducting themselves lawfully.

195)    Defendant CLS is liable for the conduct of the individual Defendants named herein on the basis of *respondeat superior* and other applicable legal doctrines.

196)    Defendants Jackson and Slay breached their duty of ordinary care when they discriminated against Plaintiff Mrs. Clifton by altering the terms of Plaintiff's employment on the basis of Plaintiff's disability and then discharging Plaintiff for the same reason, since a person exercising ordinary care would not engage in such conduct. It is foreseeable to a reasonably prudent person exercising ordinary care that discriminating against and discharging an employee on the basis of a disability they do not control would cause severe emotional distress such as depression.

197)    Defendants Jackson and Slay also breached their duty of ordinary care when they caused Defendants Battle, Beeks, and Platt to write false letters to create a pretext for Plaintiff Mrs. Clifton's unlawful discharge, since a person exercising ordinary care would not engage in such conduct. It is foreseeable to a reasonably prudent person exercising ordinary care that causing others to write false letters in order to fabricate a non-discriminatory pretext for the discharge of an employee is conduct that would tend to cause severe emotional distress such as depression.

198)    Defendants Battle, Beeks, and Platt breached their duty of ordinary care when they caused false letters to issue against Plaintiff Mrs. Clifton so that Defendants Jackson and Slay would have a pretext for their discriminatory actions relative Plaintiff, since a person exercising ordinary care would not engage in such conduct.  It is foreseeable to a reasonably prudent person exercising ordinary care that writing false letters about an employee in order to provide supervisors with a pretext for discriminatory actions is conduct that would tend to cause severe emotional distress such as depression.

199)    Defendants Hart and Watkins breached their duty of ordinary care when they failed to reasonably investigate the circumstances of Plaintiff Mrs. Clifton's termination and when they, on that basis, allowed Plaintiff to be discriminated against on the basis of Plaintiff's disability, since a person exercising ordinary care would not engage in such conduct.  It is foreseeable to a reasonably prudent person exercising ordinary care that failing to investigate a potentially discriminatory discharge, and, on that basis, allowing a person to be discriminated against is conduct that would tend to result in severe emotional distress such as depression.

200)    Defendant Morales breached her ordinary care of duty when she made false and defamatory statements to a finance provider about Plaintiff, which caused Plaintiff to be denied credit and her reputation injured, since a person exercising ordinary care would not engage in such conduct.  Plaintiff later obtained credit from a creditor before whom she was never defamed, demonstrating that it was Defendant Morales' false comments that caused Plaintiff's reputation for credit to be injured and financing denied.  It is foreseeable to a reasonably prudent person exercising ordinary care that defaming someone to a third-party creditor is conduct that would tend to cause severe emotional distress such as depression.

52

201)    As a direct and proximate result of the Defendants' conduct, Plaintiff Mrs. Clifton was caused to suffer damages including, but not limited to severe mental and emotional distress and anguish manifesting in depression, embarrassment, bouts of anger, stress, and difficulty sleeping, as well as economic damage in the form of lost income, past-due bills and expenses, inability to pay for her child's private school tuition, the loss of the main bread winner's source of income in Plaintiff's household, and inability to afford food.

Wherefore, Plaintiff demands judgment against Defendants in an amount to be determined at trial, but in excess of $75,000.00, plus interest, costs and attorneys' fees, as well as any declaratory, injunctive, or other relief to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiff demands a trial by jury for all claims so triable.  All the allegations pleaded herein, however worded, are pleaded alternatively as acts of negligence, gross negligence, intent, malice, willfulness and/or wantonness, as determined at trial by the jury in this matter.

Respectfully submitted,

*/s/ Dominique L, Camm*
Dominique L, Camm, Esq.
The Freedmen Law Group
N.C. State Bar No.: 39565
2923 S. Tryon Street Suite 220
Charlotte, NC 28203
Telephone:    704-271-2048
Fax:             704-919-5965
Email: dcammesq@gmail.com

*Attorney for Plaintiffs*